No. 20-2857

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————◆———————————

*UNITED STATES OF AMERICA*
*Appellee*

vs.

*LEVI FARREN MILLER*
*Appellant*

———————————◆———————————

APPEAL FROM THE EIGHTH CIRCUIT DISTRICT OF IOWA
CR 19-2031
*Hon. Leonard Strand, Judge*

———————————◆———————————

APPELLANT'S BRIEF

———————————◆———————————

MARK C. MEYER
425 2nd Street SE, Suite 1250
Cedar Rapids, Iowa 52401
319-365-7529
legalmail@markcmeyer.com

ATTORNEY FOR APPELLANT

_____

# I.  SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT

Mr. Miller entered a conditional plea to possession of a firearm as a felon.  He was sentenced to serve 84 months in prison.  The firearm in question was a shotgun seized from his apartment.  On appeal he asserts that his motion to suppress the seizure of the firearm should have been granted pursuant to *Franks v. Delaware*, and in addition, that the Waterloo, Iowa police violated the Fourth Amendment by entering his residence before the warrant was issued without probable cause and exigent circumstances.

Mr. Miller also claims that the Ninth Amendment reserves to the States the authority to impose criminal sanctions for firearms-related offenses.

And Mr. Miller asserts that the trial court erred in the calculation of the sentencing guidelines offense level and the resulting sentencing guidelines range.

Mr. Miller requests oral argument and believes that fifteen minutes would be necessary to address the several issues on appeal.

i

# II.   TABLE OF CONTENTS

I.   SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT .................................................................I

II.   TABLE OF CONTENTS ................................................... II

III.   TABLE OF AUTHORITIES ..............................................V

IV.   STATEMENT OF JURISDICTION ....................................1

V.   STATEMENT OF THE ISSUES ........................................2

VI.   STATEMENT OF THE CASE .........................................3

　　1.   *Kayla Borntreger's statement* ......................................*10*

　　2.   *Chelsea Cole's statement* ...........................................*11*

　　3.   *Jarrell Cole's statement* ............................................*12*

　　4.   *Copy of the Application for Warrant* ...........................*12*

VII. SUMMARY OF THE ARGUMENT .................................14

VIII.   ARGUMENT ...........................................................18

　A.   THE WARRANT TO SEARCH MR. MILLER'S RESIDENCE WAS OBTAINED IN VIOLATION OF *FRANKS V. DELAWARE* ......................................18

　　1.   *Standard of Review* ....................................................*18*

　　2.   *Argument* ...................................................................*18*

ii

a) The equivalent to a *Franks* hearing was conducted .................19

b) Based on the hearing that was held, Mr. Miller is entitled to relief under *Franks* ...........................................................20

(1) The police deliberately omitted facts with reckless disregard of whether they made the affidavit misleading ............................21

(2) The omitted information was crucial to undermining a finding of probable cause ........................................................27

(3) A judge, not the police, is the proper authority to make credibility determinations when a warrant is sought....................28

3. *Conclusion* .......................................................30

B. THE POLICE ENTERED MR. MILLER'S RESIDENCE WITHOUT A WARRANT OR PROBABLE CAUSE AND EXIGENT CIRCUMSTANCES .................................31

1. *Standard of Review*........................................................31

2. *Argument* ................................................................31

3. *Conclusion* ...............................................................36

C. THE NATIONAL FIREARMS ACT IS UNCONSTITUTIONAL BECAUSE IT USURPS THE POWER RESERVED TO THE STATES IN VIOLATION OF THE SECOND AND NINTH AND TENTH AMENDMENTS. ....................................37

1. *Standard of Review*........................................................37

2. *Argument* ................................................................37

Appellate Case: 20-2857    Page: 4    Date Filed: 12/15/2020 Entry ID: 4985259

3. *Conclusion* ..................................................................... *39*

D. SENTENCING ISSUES ..................................................... 40

1. *The trial court committed procedural error by improperly calculating the Sentencing Guidelines range* ....................... *40*

   a) Standard of Review ............................................... 40

   b) Argument ............................................................. 40

      (1) A four-level enhancement for possessing the firearm in connection with another felony offense pursuant to USSG §2K2.1(b)(6)(B) was improperly assessed. ................................. 41

      (2) The defendant's prior conviction for Conspiracy to Manufacture Methamphetamine does not qualify as a controlled substance offense, USSG §2K2.1(a)(3) ....................... 45

      *(3)* In the absence of evidence of knowledge that the barrel of the shotgun was shorter than allowed by federal law, the firearm is not one described in 26 *U.S.C. § 5845(a)* ........................... 48

2. *Conclusion* ..................................................................... *50*

IX. **CONCLUSION** ........................................................ **50**

X. **CERTIFICATES** ........................................................ **51**

XI. **ADDENDUM** ............................................................ **53**

Appellate Case: 20-2857     Page: 5     Date Filed: 12/15/2020 Entry ID: 4985259

# III. TABLE OF AUTHORITIES

## CASES

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) ...............46

*District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) ..........................38

*Franks v. Delaware*, 438 U.S. 154 (1978) ................................. 18, 20, 29, 31

*Illinois v. Gates*, 462 U.S. 213, 239 (1983)....................................................29

*Johnson v. United States*, 333 U.S. 10, 14 (1948)........................................29

*Kleinholz v. United States.*, 339 F.3d 674, 676 (8th Cir. 2003). ..................31

*Michigan v. Tyler*, 436 U.S. 499, 509 (1978).................................................32

*Rehaif v. United States*, *Rehaif v. United States*, 139 S. Ct. 2191 (2019).....49

*Schmerber v. California*, 384 U.S. 757, 770-771 (1966) ..............................32

*Segura v. United States*, 468 U.S. 796, 804 (1984)........................................36

*Singer v. Court of Common Pleas*, *Bucks County*, 879 F.2d 1203, 1206-07
   (3d Cir. 1989)..............................................................................................33

*Smith v. Kansas City*, 586 F.3d 576, 580 (8th Cir. 2009).............................33

*Staples v. United States*, 511 U.S. 600, 605-606 (1994) ...............................49

*State v. Mott*, No. 1-165 / 00-575, at *1 (Iowa Ct. App. Apr. 27, 2001) ......44

*Stinson v. United States*, 508 U.S. 36 (1993) .................................................46

Appellate Case: 20-2857    Page: 6    Date Filed: 12/15/2020 Entry ID: 4985259

*United States v Miller*, 307 U.S. 174 (1939) ...................................................38

*United States v. Belfrey*, 928 F.3d 746, 750 (8th Cir. 2019) .........................40

*United States v. Bonner*,874 F.2d 822, 825 (D.C. Cir. 1989) .......................35

*United States v. Conner*, 948 F. Supp. 821, 850 (N.D. Iowa 1996).............35

*United States v. Crawford*, 115 F.3d 1397, 1400 (8th Cir. 1997)................37

*United States v. Cruikshank*, 2 Otto 542, 92 U.S. 542, 533 (1875) ..............38

*United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980) .........................19

*United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc)......40

*United States v. Frierson*, 299 F.2d 763 (7th Cir. 1962)...............................35

*United States v. Glover*, 755 F.3d 811 (7th Cir. 2014)...................................29

*United States v. Havis*, 927 F.3d 382 (6th Cir. 2019). .......................... 47, 48

*United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993).............. 14, 20, 24, 27

*United States v. McMurtrey*, 704 F.3d 502 (7th Cir. 2013) .........................19

*United States v. Mendoza-Figueroa,* 65 F.3d 691 (8th Cir. 1995) (en banc)48

*United States v. Morrison*, 529 U.S. 598, 607 (2000)...................................37

*United States v. Mugan*, 441 F.3d 622, 627 (8th Cir. 2006) .........................37

*United States v. Petruk*, 836 F.3d 974, 976 (8th Cir. 2016)..........................40

*United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)........................18

*United States v. Santana*, 427 U.S. 38, 42-43 (1976)...................................32

*United States v. Smith*, 820 F.3d 356, 359 (8th Cir. 2016)...........................31

vi

*United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 008) ............................36

*United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir. 1990)..................34

*United States v. Williams,* 777 F.3d 1013, 1015 (8th Cir.2015) ...................31

*United States v. Winstead*, 890 F.3d 1082, 1090-92 (D.C. Cir. 2018)..........47

*United States v. Young,* 909 F.2d 442, 446 (11th Cir. 1990) ........................35

*Warden v. Hayden*, 387 U.S. 294, 298-299 (1967)........................................32

*Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)........................................32

## STATUTES

18 U.S.C § 3742(a)(1) ......................................................................................1

18 USC § 3231....................................................................................................1

26 U.S.C. § 5845(a) ................................................................................... 40, 48

Iowa Code § 708(2)(3)......................................................................................42

Iowa Code § 708.1 ..................................................................................16, 27, 43

Iowa Code § 724.4(1) and 724.4(4)(a) and (i)..............................................16

## RULES

Rule 4(b), Federal Rules of Appellate Procedure............................................1

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend IV ......................................................................................29

Appellate Case: 20-2857    Page: 8    Date Filed: 12/15/2020 Entry ID: 4985259

U.S. Const. Amend. II and IX ........................................................37

U.S. Const. art. I, § 8, cl. 18 ........................................................37

**GUIDELINES**

USSG §2K2.1(a) ........................................................45

USSG §2K2.1(a)(3) ........................................................ 40, 45

USSG §2K2.1(b)(6)(B) ........................................................41

USSG §4B1.2(b) ........................................................ 40, 45

Appellate Case: 20-2857     Page: 9     Date Filed: 12/15/2020 Entry ID: 4985259

# IV.   STATEMENT OF JURISDICTION

The district court had jurisdiction over the case because the Defendant was charged by Indictment with violations of federal law. 18 USC § 3231. The trial court judge who imposed the judgment and sentence was the Hon. Leonard Strand [District court docket document 87, hereafter designated Doc 87, filed 8/27/2020; Addendum at p. 1].  Judge Strand had previously adopted the magistrate judge's report and recommendation that Mr. Miller's motions to suppress and dismiss be denied. [ Doc 65, filed 12/27/2019, Addendum p. 59].  The magistrate judge's report and recommendation, Doc 57, filed 11/15/2019, is also in the Addendum, beginning at page 16.

Notice of appeal was timely filed on 09/4/2020 [Doc 87].

The Court of Appeals' jurisdiction lies with 18 USC § 3742(a)(1) and Rule 4(b), Federal Rules of Appellate Procedure.

1

# V.  STATEMENT OF THE ISSUES

- The warrant to search Mr. Miller's residence was obtained in violation of *Franks v. Delaware*.

*Franks v. Delaware*, 438 U.S. 154 (1978)

*United States v. McMurtrey*, 704 F.3d 502 (7th Cir. 2013)

*United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993)

*United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980)

- The Waterloo, Iowa police violated the Fourth Amendment by entering Mr. Miller's apartment without a warrant.

*Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)

*Smith v. Kansas City*, 586 F.3d 576, 580 (8th Cir. 2009)

- The Ninth Amendment reserves to the State authority to impose criminal sanctions for firearms-related offenses.

*United States v. Cruikshank*, 2 Otto 542, 92 U.S. 542, 533 (1875)

U.S. Const. Amend. II and IX

2

- The District Court judge erred in calculating the sentencing guidelines range and for imposing a sentence within the guidelines range.

Iowa Code § 708.1

*Stinson v. United States*, 508 U.S. 36 (1993)

*United States v. Havis*, 927 F.3d 382 (6th Cir. 2019)

*Staples v. United States*, 511 U.S. 600, 605-606 (1994)

## VI.   STATEMENT OF THE CASE

Mr. Miller was charged in counts 1 and 2 with being a felon in possession of shotgun with a barrel that was a fraction of an inch shorter than 18 inches in length. [Indictment filed 5/8/2019, ND Iowa FECR19-2031 case Document 2]. The shotgun was an old rusty 20-gauge pump action shotgun. [Tr. Sentencing Hearing on 8/27/2020, 59:16-18 (this is short for page 59, lines 16 to 18)].  This shotgun was seized from the kitchen of Mr. Miller's apartment by police executing a warrant.  Mr. Miller entered a conditional plea to Count 1, possession of a firearm as a felon, and was

3

sentenced to serve 84 months in prison. [Judgment in a Criminal Case filed 8/8/2020, Document 87].

The events leading to the seizure of the shotgun took place at house located at 1005 West Mullan in Waterloo, Iowa, in the evening on February 3, 2019. The police received a call from a person, Ms. Latham, who claimed that Miller, while in possession of a shotgun, had cursed at her. [Application for warrant, which is part of the warrant-related documents in Defendant's motions hearing Exhibit. References to Defendant's Exhibits will be to the motions hearings exhibits unless otherwise specified].

The two main officers who were involved in responding to the call were Officers Bovy and Thomas, from the Waterloo, Iowa police department. Bovy went to the house on West Mullan and knocked on the door at the apartment on the first floor of the house. He talked first with Latham's daughter; Latham was elsewhere. Bovy then spoke with a neighbor, Mr. Johnson, and then went up the steps to Miller's second floor apartment. There where he spoke with Miller, Miller's wife Sarabeth and another person, Ms. Randall. [Defendant's Exhibit 2, a DVD, includes Bovy's body cam video]. They told Bovy that they had heard a loud noise

Appellate Case: 20-2857    Page: 13    Date Filed: 12/15/2020 Entry ID: 4985259

outside the apartment and went to investigate, but that none of them took a gun. They also told Bovy there was no gun inside the apartment.

Officer Thomas also went to the house on West Mullan and had several eyewitnesses come to the Waterloo Police Department to be interviewed, including Ms. Borntreger, Ms. Cole and Mr. Cole, and Latham. [Defendant's Exhibit 2 also includes videos of each of these interviews].

While Bovy was speaking with Miller outside the upstairs apartment, he received word from Thomas that Latham had changed her story and now claimed that Miller had pointed the gun at her. The videos of the interviews at the police department show that none of the other witnesses Thomas interviewed at the police department backed up Latham's claim that Miller pointed a gun at her. Likewise, Bovy's body came video shows that Latham's daughter and the neighbor told Bovy before he went to Miller's apartment that they were not aware of any disturbance involving Mr. Miller and Ms. Latham.

Ms. Borntreger and the Coles did tell Thomas at the police department that they saw Miller with a gun, but Ms. Borntreger said they were all,

5

including Latham, inside Latham's porch whereas Miller was outside the house and that Miller never saw any of them, including Latham.

Bovy, after speaking with Miller, asked Miller for permission to enter the apartment and search for a shotgun. Miller refused. Bovy insisted. Miller refused. Bovy then called his sergeant, who advised Bovy to get a warrant and, moreover, to enter Miller's apartment while the warrant was applied for. Over Miller's objection, several officers entered his apartment and remained for about three hours while a warrant was obtained. [Defendant's Exhibit 7 is a body cam video of the officers entering and remaining in Miller's apartment for several hours]. The officers stayed in Miller's living room with Miller and his wife and Ms. Randall during the wait.

The warrant application, jointly prepared by Bovy and Thomas, did not advise the judge who eventually issued the warrant that their investigation did not find any evidence that Miller had pointed a gun at Latham, and in fact, that there was considerable evidence directly contrary. After the warrant was obtained, the police found a shotgun in the kitchen of the apartment.

6

A further recitation of the relevant facts with more specific references to the record is as follows.

Photos received in evidence at the motions hearing show that this residence is a two-story house divided into one upstairs and one downstairs apartment. [Gov't motions hearing Exhibit 2]. A video from a body camera worn by Waterloo Police Department Officer Bovy shows that Mr. Miller's apartment was upstairs, accessed by climbing up stairs to the second story. [Defendant's Exhibit 2, which includes Officer Bovy's body cam video[1]]. This is the only entrance to the upstairs apartment. The photos of the residence in Government's Exhibit 2 show that there is a fence immediately adjacent to the stairs so that the only way to get to the back of the house is to pass by an enclosed porch on the lower level of the house and walk around one side of the building to the back. This porch has a door into the lower-level apartment. The lower apartment also has a door at the back of the residence. Mr. Miller's neighbor in the lower apartment was Takeela Latham.

---

[1] The defense exhibits should have used letters of the alphabet, but defense counsel erred and used numbers..

Appellate Case: 20-2857    Page: 16    Date Filed: 12/15/2020 Entry ID: 4985259

The evidence received at the motions hearing indicates that there is a porch the back entrance of the residence. [Tr. Motions Hearing, 78:7-16]. Latham was interviewed at the Waterloo Police Department after she called the police. [Defendant's Exhibit 2]. In that interview Latham said that Miller often left his things on her porch, and that on the evening in question (February 3, 2019) she found a suitcase that belonged to him on the porch. This made her angry and she had a Jarrell Cole move the suitcase to a vehicle parked nearby that was associated with Mr. Miller.

What happened then is a matter of dispute, but in his application for warrant, Officer Bovy recited that Latham called the police and said that Mr. Miller came down the stairs of his apartment with a gun while yelling at her. [Warrant application, first paragraph; Defendant's Exhibit 1].

When Officer Bovy came to investigate in response to Latham's call, as shown by the body camera video in Defendant's Exhibit 2, he walked around the area near the residence and then knocked on the back door to Latham's apartment. A child, Latham's daughter, answered the door, which opened into a kitchen. The police entered and asked questions. In addition to the child, there was another young adult seated nearby, identified as the child's auntie. When asked by Bovy, the child and the auntie reported that

8

they were not aware of any disturbance, that Levi lived upstairs, and that the child's mother had left to get groceries. [Defendant's Exhibit 2, Bovy's body cam video, at minute 5:55 to about 8:00]. Neither the child nor the young adult appeared to be upset or in distress. None of this information subsequently was included in the application to search Miller's apartment.

The video on Defendant's Exhibit 2 shows that Bovy then walked to another nearby location and knocked on the door. Emmit Johnson answered the door and was questioned by Bovy. Johnson said he had heard some yelling. He thought it was Levi and his wife, Sarabeth. He looked outside and did not see anyone fighting or carrying a gun. [Defendant's Exhibit 2, Bovy body cam, about 10:00 to 13:00]. This information also was not included in the warrant application.

Bovy then walked up the stairs to Mr. Miller's apartment and knocked on that door. [Defendant's Exhibit 2, beginning at minute 13:30 et. seq]. Mr. Miller and his wife Sarabeth and another relative, Ms. Randall, were all questioned for about 45 minutes while the police stood outside the door. They all said they heard a loud sound outside the apartment and went to investigate, but all three denied that anyone carried a gun.

9

Partway through Bovy's questioning of the occupants of Mr. Miller's apartment, Bovy received information on his police radio that Latham now claimed that Miller had pointed a gun at her. This was apparently related by Waterloo Police Department Officer Thomas. Bovy pressed Mr. Miller to allow him access to the apartment to look for a gun. Miller refused. Eventually Bovy left to get a warrant.

Defendant's Exhibit 7 is another video from an officer's body camera. It that shows that several officers entered the apartment over Miller's objections. They went into the hallway and the living room

Officer Thomas spoke with several witnesses who were present at the residence and claimed to have seen Levi outside. They all agreed to go to the police statements and their statements were videotaped. This included Kayla Borntreger, Chelsea Cole, Jarrell Cole and Ms. Latham. In these videos, only Latham claimed she was upset. Ms. Borntreger, in particular, was very matter of fact and clear in her description of what had occurred. These videos are on the DVD that is Defendant's Exhibit 2.

### 1. Kayla Borntreger's statement

Borntreger was one of four people who agreed to come to the police department to give statements. In her video-taped statement at the Waterloo

10

police department (part of Defendant's Exhibit 2) Borntreger directly contracted the key part of Latham's statement, that Miller pointed a gun at Latham, and that Latham was not in Miller's line of sight, but this was not communicated to the judge who was presented the application for warrant.

Specifically, Borntreger said that she and the others were <u>inside</u> Latham's apartment when Miller came downstairs from his apartment. They went there after Jarrell Cole put the suitcase in Miller's truck. From <u>inside</u> the apartment, Borntreger could see that Miller had a gun. She described it as having a black barrel with wood along the stock. And Borntreger directly <u>denied that Miller pointed it at anyone</u>. <u>He didn't see us</u>, she said.

### 2. Chelsea Cole's statement

Chelsea Cole was interviewed at the police department immediately after Borntreger. Cole's interview lasted only a few minutes. Her interview was also on Defendant's Exhibit 2. Chelsea Cole seemed to say that she and Latham and her brother Jarrell Cole were all inside an enclosed porch when Miller came downstairs. Cole said the gun was brown, and that it was a shotgun. When asked, she said she didn't know for sure if Miller pointed the gun at anyone. Officer Thomas' report does not indicate that he or Bovy spoke with Chelsea prior to the warrant being issued.

11

### 3. Jarrell Cole's statement

Jarrell Cole was interviewed at the police department after Latham. This is also on the DVD that is Defendant's Exhibit 2. Although he said that the Miller pointed the gun, he did not state directly that Miller pointed the gun at him or Latham or otherwise describe what he meant. When gesturing with his hands, as if he was impersonating Miller holding a gun, the imaginary gun in his hand was pointed off to the side, not at the interviewer. Jarrell Cole did describe the gun as being a black with brown wood, but he did not specifically state where he was when he observed the gun.

### 4. Copy of the Application for Warrant

A copy of the application submitted to the judge that led to the issuance of the warrant to search Mr. Miller's apartment is on the following page. [Defendant's motions hearing Exhibit 1]. The application is referred to as the "Addendum." The application for warrant is also in the Addendum to this Brief at page 12.

12

# Addendum

Your Affiant is a Certified Police Officer and had been a Police Officer for over four years. Your Affiant is a current member of the Waterloo Police Department and has previously been employed with the Jesup Police department and the Buchanan County Sheriffs Department. During my employment as a Police Officer I have worked several drug cases and gun cases.

On 02/03/19 at about1817 hours, your Affiant was dispatched to 1005 West Mullan Avenue for a report of a male named Levi came out of his appartment with a shot gun yelling at the reporting party Tequila Lathem due to her taking Levi's items off of her porch and placing-in his truck. Levi was described as a white male with dreads wearing a red shirt.

Your Affiant arrived at 1005 West Mullan Avenue and Tequila Lathem had already left the scene due to the altercation. Your Affiant located Levi Miller (08/21/1990) in his appartment 1005 1/2. Miller is a white male with dreads and he was wearing a red shirt. The appartment was also occupied by Sarabeth Miller (02/05/1993) and Michele Randall (02/27/86).

Your Affiant spoke with the three individuals in the appartment and they informed me that all three of them had gone out side and around to the back of the residence after hearing a loud noise because they thought someone was damaging their truck that is parked in the parking lot behind the residence. Sarabeth Miller was the first one to go out side followed by Levi Miller, and then by Michele Randall. Sarabeth Miller stated that she was carrying a broken pool stick and Levi was carrying a larg black knife about 11 inches long. Sarabeth walked by the reporting party Tequila Lathem behind the residence and stated Lathem was in an argument with a boy. Sarabeth Miller checked her truck for damage and then they all went back to her appartment.

Levi Miller and Sarabeth Miller informed your affiant that they had a long BB gun in the appartment and showed it to me. The BB gun was blue in color and had a brown stock.

Officer Thomas with the Waterloo Police Department spokeTakeela Latham who advised while at her home at 1005 W Mullan, she walked out of her residence and noticed a suitcase on her deck. Latham advised she did not put the item there and knew her upstair neighbor Levi Millier has placed items on the deck before with her permission. Latham advised here friend Jarrell Cole to take the suite case and place it in Levi Millers truck which located in the parking area of the apartment. Latham then advised she heard someone coming down the stairs from the upstairs apartment. Latham advised she turned to see Levi Miller walking with a shotgun in his hands and cursing. Latham advised Miller pointed the gun at her and Jarrell Cole. Latham described the gun as having a black barrel and wood along the stock. Latham advised herself and Cole ran back into their apartment.

I spoke with witnesses Kayla Borntreger and Chelsea Cole who were also on scene as the incident unfolded. Chelsea Cole and Borntreger advised the gun was black in color and had wood coloring around the stock. Borntreger and Chelsea Cole advised Levi Miller as wearing a red shirt and having dreads in his hair pulled back into a pony-tail.

SUBSCRIBED AND SWORN TO BEFORE ME BY:

Alex Bovy

Applicant

Applicant / Signature

This 3rd  Day of  February , 2019

Page 1 of 2

Magistrate / Judge

WPD-000021

Mr. Miller filed several pretrial motions, including a request for a *Franks* hearing, a motion to suppress and two motions to dismiss. [Case Documents 11, 12, 14, 17].  The Magistrate Judge held hearings on the motions [Document 53] and then recommended that the motions be denied. [Document 57].  The Magistrate Judge's recommendation was adopted by the District Court. [Document 65].

## VII.    SUMMARY OF THE ARGUMENT

The warrant application was a collaboration between Officer Thomas, who interviewed four witnesses at the police department, and Officer Bovy, who interviewed people at Latham's residence and in the neighborhood. This application for warrant omitted any information derived from Thomas' interviews and Bovy's investigation that contradicted Latham's claims that Miller pointed a shotgun at her, which was the key fact that justified issuing a warrant for the search of Miller's apartment.

This is quite similar to what happened in *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993).  In *Jacobs*, the application for warrant advised the judge that a drug dog had shown interest in a package that police wanted to search.  But the officer who presented the application for warrant did not tell

14

the judge that another officer who was present reported that the dog did not alert on the package. Because it was misleading to omit from the application for warrant highly relevant information about the dog's reaction to the package, this Court in *Jacobs* ordered that the evidence derived from the search of the defendant's property must be suppressed.

The magistrate judge in Miller's case attempted to distinguish *Jacobs* by finding that whether Miller pointed a gun at Latham was not material because Miller even if Miller did not point the gun at Latham, he committed a crime – assault – by carrying a gun outside his apartment, and this justified the search of his apartment, to wit:

> Thus, had Officer Bovy included Ms. Borntreger's statement that Defendant did not see the eyewitnesses and did not point the shotgun at them, the eyewitness statements would still have created a fair probability that evidence of a crime (i.e., a shotgun as evidence of an assault) would be found in Defendant's residence.
>
> [Magistrate's R&R, filed 11/15/19, Document 57, at page 26].

In order for a search warrant to issue, a judge has to find that there is probable cause that there is evidence of a crime in the place to be searched. It is not illegal to open carry a firearm in Iowa on land that he rents or if the

person has a permit. Iowa Code § 724.4(1) and 724.4(4)(a) and (i). [2] Also, under Iowa law, specifically Iowa Code § 708.1, to be guilty of assault with a dangerous weapon the weapon has to be pointed toward another. Simply carrying the gun in public is not a crime. Therefore, contrary to the magistrate judge's findings, whether Miller pointed the gun at Latham is determinative of whether a judge could find that the gun was evidence of a crime.

Moreover, the final paragraph of the application for warrant suggested that Borntreger confirmed Latham's claims when in fact she directly told Thomas that Miller did not even see Latham, let alone point a gun at her. Mentioning Borntreger without informing the judge that she directly contradicted Latham was done, as in *Jacobs*, at least reckless disregard of its effect on the affidavit.

---

[2] Iowa Code § 724.4(1) provides:

Except as otherwise provided in this section, a person who goes armed with a dangerous weapon concealed on or about the person … commits an aggravated misdemeanor. Exceptions include:
"A person who goes armed with a dangerous weapon in the person's own dwelling or place of business, or on land owned, possessed, or rented by the person." Iowa Code § 724.4(4)(a).
"A person who has in the person's possession and who displays to a peace officer on demand a valid permit to carry weapons which has been issued to the person, and whose conduct is within the limits of that permit." Iowa Code § 724.4(4)(i)

Appellate Case: 20-2857    Page: 25    Date Filed: 12/15/2020 Entry ID: 4985259

Regarding the police entering Miller's apartment without a warrant, the police could have safely secured the apartment from the outside while waiting for a warrant to issue; no entry was required. And contrary to the claim that the police needed to enter to look to make sure there were no other people in the apartment, when they entered the apartment they did not go room to room. They just stayed in the living room of the apartment. In addition, securing the apartment from the outside would not create a risk that evidence would be destroyed because a shotgun, unlike heroin or cocaine or marijuana, is not capable of being destroyed or otherwise removed from the residence while the police are watching from outside.

Regarding his motion to dismiss, Mr. Miller argues that under the Ninth Amendment, prosecution of criminal conduct relating to firearms is reserved to the States.

There are also sentencing issues. This includes that the district court judge improperly calculated the guidelines sentencing range. On one hand, the judge determined that Ms. Latham was not a credible witness. But on the other hand, the judge found that Mr. Miller committed another felony offense, namely, assault while displaying a dangerous weapon in violation of Iowa Code § 708.(2)(3), simply by carrying a shotgun in public, which

17

several witnesses observed him do.  The judge thereby erred, Mr. Miller respectfully asserts, because under Iowa Code § 708.1, to be guilty of an assault with a firearm, the firearm must be pointed or directed toward another, and there is no credible evidence that he did so.

## VIII.   ARGUMENT

### A.   THE WARRANT TO SEARCH MR. MILLER'S RESIDENCE WAS OBTAINED IN VIOLATION OF *FRANKS V. DELAWARE*

#### 1.  *Standard of Review*

"Although absent clear error we are bound by the district court's findings of fact [regarding statements made in an application for warrant], we may reverse if that court's ultimate ruling on suppression reflects an erroneous view of the applicable law."  *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)

#### 2.  *Argument*

As noted in *Reivich*, 793 F.2d at 960, a facially sufficient affidavit may be challenged on the ground that it includes deliberate or reckless falsehoods, *Franks v. Delaware*, 438 U.S. 154 (1978), and this rule has been extended to allow challenges to affidavits based on alleged deliberate

18

omissions of material facts. *See United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980).

### a) The equivalent to a *Franks* hearing was conducted

There is authority for conducting a pre-*Franks* hearing to take evidence from the defense in support of a *Franks* hearing. In *United States v. McMurtrey*, 704 F.3d 502 (7th Cir. 2013), the Seventh Circuit addressed what options a district court has when a *Franks* challenge to a warrant has been made. According to *McMurtrey*, a district court that is in doubt about whether to hold a *Franks* hearing has discretion to hold a "pre-*Franks*" hearing to give the defendant an opportunity to supplement or elaborate on the original motion. *McMurtrey*, 704 F.3d at 504-505.

Mr. Miller references *McMurtrey* because, at the commencement of the motions hearing held on October 7, 2019, the Court expressed some doubt about whether to hold a *Franks* hearing. [Tr. Motions hearing, 5:21 to 6:1] According to *McMurtrey*, the government would not be involved in a "pre-*Franks*" hearing and the court should not give the government an opportunity to present its evidence on the validity of the warrant without converting the hearing into a full evidentiary *Franks* hearing, including full cross-examination of government witnesses. *McMurtrey*, 704 F.3d at 504.

19

Here, in Mr. Miller's case, the prosecution did present evidence upon which the Magistrate relied and called witnesses who were cross-examined, so it was in all respects like a *Franks* hearing.

### b) Based on the hearing that was held, Mr. Miller is entitled to relief under *Franks*

When, as in this case, a *Franks* hearing or its equivalent is held, it is the defendant's burden to show by a preponderance of the evidence that the false or misleading statement was included in the affidavit by the affiant knowingly and intentionally, or with reckless disregard for the truth. And if the statement was necessary to the finding of probable cause, then the search warrant must be voided, and the fruits of the search excluded from the trial to the same extent as if probable cause was lacking on the face of the affidavit. *Franks v. Delaware*, 438 U.S. at 155-156.

In *United States v. Jacobs*, 986 F.2d 1231, 1234-35 (8th Cir. 1993) this Court, applying *Reivich*, found that a warrant was issued based on misleading facts. The facts recited in the warrant application in in Miller's case, as set forth below, are no less misleading than those in *Jacobs*.

In *Jacobs*, an Iowa City, Iowa police officer, Mike Brotherton, applied for a warrant to search a package. The application correctly informed the

20

magistrate judge that a dog (Turbo) had shown an interest in the Jacobs'
package, but neglected to include another officer's (Henderson's) statement
that Turbo had not alerted on the package. The Eighth Circuit found that the
evidence omitted made the affidavit misleading and because the highly
relevant nature of the omitted information, the omission was made with at
least reckless disregard of its effect on the affidavit.

> (1) The police deliberately omitted facts with
> reckless disregard of whether they made the
> affidavit misleading

The R&R stated that, "Defendant does not offer evidence that Officer
Bovy omitted information to intentionally mislead the issuing judge," or
with reckless disregard for the truth. [R&R, p. 20 and 21-23, respectively].
The district court agreed. [Order affirming R&R, Document 65, pp.19 and
24]. Mr. Miller contests these finding and submits the following evidence in
support of his objection.

Bovy testified that he collaborated with Officer Thomas in drafting
the application [Tr. Motions hearings, 62:9-14]. Thomas' drafted the last
two paragraphs of the application, according to Bovy. Thomas agreed that
he was with Bovy when Bovy prepared the application, although he denied
that he typed any part of the application. [Tr. Motions hearings, 98:3-6].

21

Thomas disputed that and said that he spoke with Bovy while Bovy prepared and typed the written application. In any event, only Bovy signed the application because, Bovy testified, there was just one place for a signature on the form they were using. [Tr. Motions hearing, 65:4-12].

Neither Bovy or Thomas had much experience drafting warrants, that is, three or less for both officers. [Tr. Motions hearing, 73:20 to 74:2 (Bovy) and 91:12-18 (Thomas)]. The local county attorney's office did not provide them with any assistance. [Tr. Motions hearings, 47:22-25].

Latham's claim when she made the call to which the police responded was that Miller had a gun and was yelling. This was included in the second paragraph of the warrant application, that Bovy prepared. [Addendum p. 12]. Latham's subsequent claim, in the part of the warrant application that Thomas prepared (second paragraph from the bottom), was that Miller pointed the gun at her, wit:

"… a male named Levi came out of his apartment with a shotgun yelling at the reporting party due to her taking Levi's items off of her porch and placing in his truck."

Thomas knew when the application for warrant was prepared that Borntreger, who was with Latham, had directly contradicted Latham's claim

22

that Miller pointed a gun at her. Thomas also knew that Borntreger told him that she and Latham and the Coles were inside Latham's apartment and Miller <u>never even saw them</u>. [Borntreger interview, Defendant's motions hearing Exhibit 2, at about 3:13:30 to 3:14 on the video]. Thomas knew that Latham told him that Borntreger was her friend and had the best view of Miller. [Latham interview, Defense motions hearing Exhibit 2, at about 2:54 on the video]. Thomas knew that Chelsea Cole, in her statement to him, was somewhat vague but also seemed to indicate that she was inside the apartment with Latham and Jarrell Cole and she said she did not know if Miller pointed a gun at anyone. [C. Cole interview, Defendant's motions hearing Exhibit 2, at about 3:17 on the video]. Yet none of this information was included in the application for warrant because, Thomas testified, he deliberately included only what supports what Latham had to say, to wit:

> Why did you just put in what Latham said and not what Borntreger said?
>
> A. Because Latham was the initial victim on the call. She's the one that called in about – and she lives at that residence. She's the one that called in about it, so --
>
> Q. So the reason you didn't put that in the application for warrant is because the warrant pertained to a complaint by Latham? Is that what you're saying?
>
> A. That's where the initial call was from, yes.

23

Q.   So when you -- when you prepare applications for warrants, am I fair to conclude that you only put in the stuff that supports what the  complaining witness has to say?

A.   And with the developments of the crime as we see it.

[Tr. Motions hearings, 101:21-102:13].

In other words, although eyewitnesses including Borntreger told Thomas things that were directly contrary to what the "primary victim" said, Thomas deliberately omitted that contrary information from the warrant application.  The upshot is that even if Thomas did not intend to deceive the judge who issued the warrant, he omitted information with at least reckless disregard for its effect on the application, just as Officer Brotherton did not include Officer Henderson's report in the *Jacobs* case.

Moreover, there is evidence that Thomas did deliberately frame the information he had obtained in a misleading manner.  Specifically, in the next to last paragraph of the application, that Thomas drafted, the application recites a very incomplete version of what Borntreger and Cole said about the incident.

I spoke with witnesses Kayla Borntreger and Chelsea Cole who were also on scene as the as the incident unfolded. Chelsea Cole and Borntreger advised the gun was black in color and had wood coloring around the stock. Borntreger and Chelsea Cole advised Levi Miller as wearing a red shirt and having dreads in his hair pulled back into a pony tail.

24

This paragraph suggests that Borntreger and Cole corroborated Latham's allegations when in fact all that they corroborated was that Miller had a gun, which as discussed below, is not a crime. Thomas was with Bovy when this statement was presented to the judge along with the other statements in the application for warrant. [Tr. Motions hearing, 20:20-22].

Likewise, in addition to what Thomas did not include in the warrant application, there was highly relevant information that Bovy knew from his investigation that was also omitted from the application for warrant. This includes that Bovy had talked to two people who were in Latham's apartment shortly after he arrived to investigate. These two people, one whom was Latham's daughter, answered the back door of Latham's apartment, where the deck was located, and said that they were not aware of any recent disturbance in or around the apartment. [The video of Bovy speaking with Latham's daughter is on Defendant's motions hearing Exhibit 2]. And after Bovy spoke to the people in the apartment, he then spoke to a neighbor, Mr. Johnson, who said that he had heard Miller and his wife arguing but that nothing else had occurred.

Bovy testified he did not include this information in the application because the daughter and Johnson stated they "weren't part of it and did not know what was going on," to wit:

> A.  The occupants of the downstairs apartment, 1005, was the juvenile and the other female.  And I don't know exactly what they were doing or whatever, but they stated they weren't a part of it and didn't know what was going on.  So that's why they were left out.
>
> [Tr. Hearing on motions, 60:22-61:2].

Contrary to Bovy's testimony, Latham's daughter directly told him that there had been no disturbance, that she knew who Miller was, and that he lived upstairs. [Defendant's Exhibit 2, Bovy's body cam video, at minute 5:55 to about 8:00].  And it stands to reason that if Miller had threatened Latham with a gun outside the apartment, Latham would have let the daughter know and would not left the residence without her daughter.

Also, the neighbor, Mr. Johnson did not tell Bovy that he didn't see what happened.  Johnson described what he saw, and it did not include Miller carrying a gun and threatening Latham with it. [Bovy body cam, about 10:00 to 13:00].

 In conclusion, Mr. Miller asserts that because of the highly relevant nature of the facts that Bovy and Thomas omitted from the application for

26

warrant, the omissions were made, as in *Jacobs*, with at least reckless disregard of its effect on the affidavit. In fact, Thomas did more than just omit information – the next to last paragraph of the application that he authored suggests that Borntreger corroborated Latham's statement that Miller had pointed a gun at her.

> (2) The omitted information was crucial to undermining a finding of probable cause

The magistrate judge also found, and the district court judge adopted the finding, that even if the information that Bovy and Thomas deliberately omitted from application had been presented to the judge, the eyewitness statements would have created a fair probability that Miller had committed a crime – assault – and that evidence of the assault, a shotgun, would be found in his apartment. [R&R, p. 26; and Order affirming R&R, Document 65, p. 20].

Mr. Miller's response is even if Miller had a gun and yelled at Latham, as stated in the second paragraph of the application for warrant, this lacks sufficient detail to support a finding that Miller thereby committed an assault. Simply carrying a firearm is not an assault in Iowa. *See* Iowa Code § 708.1 which provides, in relevant part, that a person commits an assault if

27

that person "intentionally points any firearm toward another, or displays in a threatening manner any dangerous weapon toward another." (emphasis added). Since carrying a firearm in public is not a crime in Iowa if a person has a permit, and since there was no evidence presented to the judge in the application for warrant or otherwise that Miller did not have a permit or was a felon [Tr. Motions hearings, 70:16-21], that Miller openly carried a shotgun is not a basis for any judge to conclude that there would be evidence of a crime in his apartment.

(3) A judge, not the police, is the proper authority to make credibility determinations when a warrant is sought

The R&R spends a considerable amount of time constructing an after-the-fact justification for Bovy's deliberate omission of important information from the application for the warrant. [R&R, pp. 20 – 24; see Order affirming R&R, Document 65, at p. 19 ]. The justification, summarized, is that Bovy had reason to believe Latham because eyewitnesses are sometimes reluctant to be fully forthcoming.

Mr. Miller asserts that the entity who should have evaluated this information was the judge to whom the application for warrant was presented. That judge should have been given the information that

28

contradicted Latham's stories and any justifications that Bovy wanted to offer for finding her credible. This is because based on the Fourth Amendment, U.S. Const. Amend IV, there is a strong preference for the use of search warrants, and this calls for probable cause determinations to be made by a "neutral and detached magistrate" and not "officer[s] engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948).

The application for a warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). The ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit. *Franks v. Delaware*, 438 U.S. at 155-56.

The accuracy of the information presented was the focus in *United States v. Glover*, 755 F.3d 811 (7th Cir. 2014). In *Glover*, the Court concluded that the affidavit for warrant provided an insufficient basis for the search warrant because it omitted all information regarding the informant's credibility. *United States v. Glover*, 755 F.3d at 814. *Glover* noted that, "[c]ases that test the sufficiency of affidavits for warrants obtained based on informants are highly fact-specific, but information about the informant's

29

credibility or potential bias is crucial." *Glover* cited the concern that minimally corroborated information from an unreliable informant raises the concern that the tip was provided to harass or remove a rival. *Glover*, 755 F.3d at 816.

Mr. Miller likewise asserts that it was crucial to give the judge an accurate picture of Latham's credibility. That was not something for the police to unilaterally decide. In this case, Officers Bovy and Thomas decided that although Latham had a motive to harass Miller because she was angry with him for putting things on her deck, that was not something the judge needed to know. And they decided that the judge did not need to know that Latham didn't like Miller and had an ongoing dispute with him [Latham interview, Miller Exhibit 2, at about 2:55:30]. And they decided that the judge did not need to know, as previously noted, that most of what Latham said about where she was and what Miller did was contradicted or not corroborated by persons the police had interviewed before the warrant application was drafted.

### 3. Conclusion

Mr. Miller asks this Court to find that the information that Bovy and Thomas omitted from the application for warrant was crucial to the

determination of probable cause to find that Miller had committed a crime. Accordingly, Miller was entitled to relief under *Franks v.Delaware*. Excising the false and misleading information that Miller pointed a gun at Latham from the warrant there is not probable cause to believe that there was evidence of a crime in Miller's apartment and therefore the evidence that a shotgun was found therein should have been suppressed.

### B. THE POLICE ENTERED MR. MILLER'S RESIDENCE WITHOUT A WARRANT OR PROBABLE CAUSE AND EXIGENT CIRCUMSTANCES

#### 1. *Standard of Review*

"A mixed standard of review applies to the denial of a motion to suppress evidence." *United States v. Williams,* 777 F.3d 1013, 1015 (8th Cir.2015). "We review the district court's findings of fact for clear error and the denial of the suppression motion *de novo. United States v. Smith*, 820 F.3d 356, 359 (8th Cir. 2016).

#### 2. *Argument*

In certain narrow situations, therefore, exigency may be substituted for a warrant, but probable cause must be present before either a warrant or exigency will allow a search. *Kleinholz v. United States.*, 339 F.3d 674, 676 (8th Cir. 2003).

31

The Government has the burden to show that some exception to the warrant requirement justifies a warrantless search. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984), where the Court recited that prior decisions of the United States Supreme Court have emphasized that exceptions to the warrant requirement are "few in number and carefully delineated," and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. "Indeed," as noted in *Welsh*, "the Court has recognized only a few such emergency conditions, *see, e. g., United States v. Santana*, 427 U.S. 38, 42-43 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298-299 (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770-771 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (ongoing fire), and has actually applied only the 'hot pursuit' doctrine to arrests in the home, see *Santana*, *supra*."

Defense Exhibit 7 is a video that shows that Officer Bovy and other members of the Waterloo police entered Miller's apartment over Mr. Miller's objections and without his consent or the consent of anyone in the apartment. The police remained there in the apartment for at least two hours while Bovy prepared and presented an application for a warrant to search the

32

residence.  Officer Bovy's supervisor testified that a review of the body cam videos did not show that the occupants were told that there were free to go. [Tr. Motions hearings, 122:25 to 123:9].  Notably, on the two occasions that Miller and his wife left the apartment, they were accompanied by an officer. [Tr. Motions hearing, 30:19-24 (Miller); 30:25 to 31:7(Miller's wife)].  For all practical purposes, then, both the occupants and the apartment were seized by the police without a warrant.

The facts of Miller's case are like those in *Smith v. Kansas City*, 586 F.3d 576, 580 (8th Cir. 2009).  In both cases, the police entered a residence when they had no basis to conclude anyone was in danger.  In *Smith*, Officer Malek, who was being sued for violating Smith's constitutional rights, contended that the fact that a domestic violence suspect was inside the home — with a child — was an exigent circumstance  justifying his warrantless entry into the home. This Court rejected that argument because the presence of a domestic violence suspect, however, did not alone justify Officer Malek's warrantless entry, citing *Singer v. Court of Common Pleas*, *Bucks County*, 879 F.2d 1203, 1206-07 (3d Cir. 1989) (noting that concerns of danger to police or others did not justify warrantless entry into the home of a domestic violence suspect as the victims were no longer present and were in

33

no danger). Likewise, in Miller's case, Latham, the supposed victim, was not present in the apartment and no one was in danger.

At the hearing on Miller's pretrial motions, the Government presented evidence to support the theory that police entry was justified to protect themselves; in other words, the Government claimed that the police could bootstrap a warrantless entry into the residence by coming to the apartment to speak with Miller and the other occupants about the claim that Miller had come out of his apartment with a shotgun. [Tr. Motions hearing, 86:2-7]. However, the video shows that upon entry the police stayed in the hallway and living room and did not enter several rooms where, ostensibly, other people might have been present. [Tr. Motions hearing, 125:15-23]. If officer safety were a valid concern the officers would have gone room to room looking for other people.

Moreover, the police had no reason to believe anyone who was armed and dangerous was in the apartment, given that Miller, the person who was reported to have been seen with a shotgun, was in their presence. *See United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir. 1990) (the danger justifying a protective sweep comes from the possible presence of armed and

34

dangerous persons in the vicinity), cited in *Smith v. Kansas City*, 586 F.3d at 580-81.

The police also tried to justify their entry by claiming it was necessary to prevent the destruction of evidence. [Tr. Motions hearing, 86:5-7]. Obviously, a shotgun is not the type of item that could be flushed down the toilet or otherwise disposed of if the officers had secured the residence from the outside. *Compare United States v. Young,* 909 F.2d 442, 446 (11th Cir. 1990) ("As many courts have noted, the need for the exigent circumstance doctrine is particularly compelling in narcotics cases, because contraband and records can be easily and quickly destroyed while a search is progressing.") And there was no evidence that Miller was engaged in the destruction of evidence. *See United States v. Conner*, 948 F. Supp. 821, 850 (N.D. Iowa 1996) ("there can be no claim that immediate police action was needed to prevent the imminent destruction of vital evidence."); c*ompare United States v. Bonner*,874 F.2d 822, 825 (D.C. Cir. 1989) (exigency exists where, *inter alia*, "officers heard sounds consistent with . . . destruction of the object of the search"); and *United States v. Frierson*, 299 F.2d 763 (7th Cir. 1962) (an exigency exists where officers heard "get rid of the stuff; get

35

rid of the spoon"), cert. denied, 371 U.S. 963 (1963), both cited in *Connor*, 948 F. Supp. at 850.

Accordingly, Mr. Miller objects to the magistrate judge's finding, as adopted by the district court, that exigent circumstances justified the police making a warrantless entry into Mr. Miller's apartment before the warrant was obtained. [R&R, p. 28-30 (officer safety) and 30-31 (destruction of evidence; Ruling adopting R&R, Document 65, pp. 28 et. seq.].

### 3. Conclusion

The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 008) quoting *Segura v. United States*, 468 U.S. 796, 804 (1984). In the instant case, the fruit of the *Franks* violation includes the shotgun and other evidence seized from the apartment and Mr. Miller's person on the authority of the warrant. And the "fruit" derived from the illegal warrantless entry includes be any observations made by the police about what Mr. Miller and his wife and companion said or did upon and during the police entry into

36

Miller's apartment; or what the police saw inside the residence while waiting for the warrant to be obtained.

### C. THE NATIONAL FIREARMS ACT IS UNCONSTITUTIONAL BECAUSE IT USURPS THE POWER RESERVED TO THE STATES IN VIOLATION OF THE SECOND AND NINTH AND TENTH AMENDMENTS.

#### 1. *Standard of Review*

In *United States v. Mugan*, 441 F.3d 622, 627 (8th Cir. 2006) the appellant made a constitutional challenge based on the commerce clause, U.S. Const. art. I, § 8, cl. 18, to a statute under which he was prosecuted. The Court noted that,

> While we review a challenge to the constitutionality of a statute *de novo*, *United States v. Crawford*, 115 F.3d 1397, 1400 (8th Cir. 1997), cert. denied, 522 U.S. 934, 118 S. Ct. 341, 139 L. Ed. 2d 264 (1997), "due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds," *United States v. Morrison*, 529 U.S. 598, 607 (2000).

#### 2. *Argument*

Although there is contrary authority, to preserve the issue, Mr. Miller asserts that the National Firearms Act, which includes the statute cited in Count 1 of the Indictment, is unconstitutional because it usurps the power reserved to a state in violation of the Second and Ninth Amendments, U.S. Const. Amend. II and IX. The latter provides that, "The enumeration in the

37

Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

Mr. Miller relies on *United States v. Cruikshank*, 2 Otto 542, 92 U.S. 542, 533 (1875), the Court held that,

> " `[B]earing arms for a lawful purpose' . . . is one of the amendments that has no effect than to restrict the powers of the National Government leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes, to what is called, in The City of New York v. Miln, 11 Pet. 139, the "powers which relate to merely municipal legislation, or what was, perhaps, more properly called internal police," "not surrendered or restrained" by the Constitution of the United States."

But later, in U*nited States v Miller*, 307 U.S. 174 (1939), the Supreme Court held that the National *Firearms* Act was not unconstitutional as attempt to usurp police power reserved to state, or as violation of the Second Amendment.  Thereafter, in *District of Columbia et al. v. Heller*, 554 U.S. 570 (2008), the Court held that while the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation," 554 U.S. at 593, the right to possess firearms is not beyond the reach of all government regulation. 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the

38

right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

Judge Scalia in the *Heller* case focused on the Second Amendment issues and how broad is the scope of its protections, not the Ninth Amendment issue. Given a newly constituted Supreme Court seemingly tends toward constitutional originalism, *Cruikshank rather* than *Miller* may more closely reflect the views of the current members of the Supreme Court with respect the powers reserved to the States.

### 3. Conclusion

Mr. Miller's Ninth Amendment claim was presented to and denied by the magistrate judge and the district court. [Order adopting R&R, Document 65, p. 36; R&R, Document 57, p. 40]. For the reasons and upon the authority cited above, Mr. Miller asserts that although firearms may be regulated, the Ninth Amendment reserves such regulation to the States.

### D. Sentencing issues

#### 1. The trial court committed procedural error by improperly calculating the Sentencing Guidelines range

##### a) Standard of Review

When reviewing a challenge to a sentence, this Court ensures that the district court committed no procedural error, such as improperly calculating the Guidelines range. *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). In so doing, "we review the district court's factual findings for clear error and its application or interpretation of the Guidelines de novo." *United States v. Belfrey*, 928 F.3d 746, 750 (8th Cir. 2019), quoting *United States v. Petruk*, 836 F.3d 974, 976 (8th Cir. 2016).

##### b) Argument

Pursuant to USSG §2K2.1(a)(3) if a prohibited person possesses a firearm described in 26 U.S.C. § 5845(a), the offense level is 18. If the defendant has a prior conviction for a controlled substance offense, as defined in USSG §4B1.2(b), the offense level is 20. And if the firearm is one described in 26 U.S.C. § 5845(a) and the defendant has a prior controlled substance offense, then pursuant to USSG §2K2.1(a)(3) the base offense level for the offense is 22. If none of the above apply, the offense level is 14.

Appellate Case: 20-2857     Page: 49     Date Filed: 12/15/2020 Entry ID: 4985259

In addition, the offense level for a person sentenced for being a felon in possession of a firearm is increased by an additional four levels if the firearm was used in connection with another felony offense. USSG §2K2.1(b)(6)(B).

For the reasons set forth as follows, Mr. Miller asserts that the district court erred by finding that he used a firearm in connection with another felony offense (a 4-level enhancement), and by finding that he was in possession of a firearm described in 26 USC § 5845(a) after having been convicted of a controlled substance offense (thereby adding 8 levels to the base offense level of 14).

> (1) A four-level enhancement for possessing the firearm in connection with another felony offense pursuant to USSG §2K2.1(b)(6)(B) was improperly assessed.

As he told Officer Bovy when Bovy came to his apartment [Defendant's motions hearing Exhibit 2, Bovy's body cam video], Mr. Miller investigated a loud noise outside his home that he and his family interpreted as someone trying to break into their vehicle. The video of the police coming into the apartment show that the apartment was in disarray, and that Mr. Miller explained that this was because his apartment had

41

recently been burglarized and ransacked. This video was Defendants motion hearing exhibit 7.

The district court judge agreed, at Miller's sentencing hearing, after hearing Latham's testimony, that Latham's claim that Miller pointed a gun at her was not credible. [Tr. Sentencing hearing, 80:11 to 81:1]. The other person who was present at the scene, J. Cole, initially told Officer Thomas while being interviewed at the Waterloo police department that Miller pointed a gun in his direction. [Exhibit 2, J. Cole interview]. But later, when testifying before the grand jury, J. Cole said he turned and walked away after seeing a glimpse of a gun and that he did not see Miller point a gun. [Exhibit 5, GJ-000007]. The Government did not call Cole as a witness at the sentencing hearing.

Nonetheless, the judge applied the four-level enhancement pursuant to USSG §2K2.1(b)(6)(B) by finding that Miller, by simply carrying the weapon in a "hostile situation," committed the offense of assault while displaying a dangerous weapon, an aggravated misdemeanor under Iowa law. *See* Iowa Code § 708(2)(3). The judge's reasoning was as follows.

> And then 708.2(3), if the individual uses or displays a dangerous weapon in connection with that assault, that's an aggravated

42

misdemeanor under Iowa law. I do find that this incident, even though I cannot find that Mr. Miller actually pointed the firearm at any of the other individuals involved, he did commit an assault by bringing this shotgun outside with him in a hostile and confrontational situation, displaying it in a manner where the other individuals were able to see that he had it.

[Tr. sentencing hearing, 82:14-82:23].

It is true that several people who were present at the residence told the police that they observed Mr. Miller with a firearm after he left his apartment and approached his vehicle. And it is true that under Iowa Code § 708.2(3), a person who uses or displays a dangerous weapon in connection with the assault, is guilty of an aggravated misdemeanor. But the key point is that under Iowa Code § 708.1, simply carrying a firearm is not an assault Iowa Code § 708.1 provides, in relevant part, that a person commits an assault with a firearm if that person "intentionally points any firearm toward another, or displays in a threatening manner any dangerous weapon toward another." (emphasis added). The district court judge essentially read the word "toward" out of the Chapter 708.1 by finding that Mr. Miller committed an assault by having a firearm in view of others.

Accordingly, Mr. Miller asserts, merely possessing a firearm in view of another, even in a hostile situation, is not a violation of the Iowa assault

43

chapter. The word "toward" in the statute is not surplusage. *See e.g. State v. Mott*, No. 1-165 / 00-575, at *1 (Iowa Ct. App. Apr. 27, 2001). In *Mott*, Mr. Baker testified that Mott was angry when he came into Baker's office demanding to know the location of Hobbs, Mott's girlfriend. Baker denied any such knowledge, but testified he believed Mott assumed he would know where Hobbs was. Mott then stabbed a calculator with a knife he was carrying. Mott kept the knife out while walking around the office. He then stabbed a desk that was not by where Baker was sitting. Afterwards, Mott continued to persist in his questions regarding the whereabouts of his girlfriend. On these facts, the Court of Appeals held that based on these circumstances, a reasonable jury could find Mott displayed a weapon in a threatening manner toward Baker. *Mott*, at *1.

In conclusion, Mr. Miller asserts that the judge was correct in finding that Latham was not credible but incorrect in finding that by simply carrying the gun without pointing it at anyone Miller committed an aggravated misdemeanor under Iowa law (assault with a dangerous weapon). Under Iowa law merely displaying a firearm is not an assault. Neither the mens rea element (intentionally points) nor the actus rea element (toward another) of

44

assault involving a firearm under Chapter 708.1 are met under the facts as found by the judge.

> (2) The defendant's prior conviction for Conspiracy to Manufacture Methamphetamine does not qualify as a controlled substance offense, USSG §2K2.1(a)(3)

There being a Circuit split on this issue, Mr. Miller asserts that Conspiracy to Manufacture Methamphetamine, the controlled substance offense used to enhance his guidelines offense level, does not qualify as a controlled substance offense under USSG §2K2.1(a)(3). The district court denied relief on this claim. [Tr. Sentencing Hearing, 8:14 to 9:1]. The basis for this argument is as follows.

The Application Notes to USSG §2K2.1(a) provide that "Controlled substance offense" has the meaning given that term in USSG §4B1.2(b) and Application Note 1 of the Commentary to §4B1.2 (Definitions of Terms Used in Section 4B1.1). That Guideline, § 4B1.2(b), in turn, states that the term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a

45

controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.  Notable is that Conspiracy Offenses are not listed as Controlled Substance Offenses in §4B1.2(b).

The Commentary to this Guideline does expand the list of offenses to include Conspiracy.  Mr. Miller asserts, however, asserts that the Commission's use of commentary to add conspiracy crimes to the definition of "controlled substance offense" deserves no deference.  *See Stinson v. United States*, 508 U.S. 36 (1993).  *Stinson* held that the commentary to a sentencing guideline should "be treated as an agency's interpretation of its own legislative rule." 508 U.S. at 44-45, citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). Thus, "[c]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson*, 508 U.S. at 38. If the two are inconsistent, "the Sentencing Reform Act itself commands compliance with the guideline." *Stinson*, 508 U.S. at 43 (citing 18 U.S.C. § 3553(a)(4), (b)).

By purporting to add offenses to those listed in the Guideline – rather than interpret or explain the ones already there – the Commentary in

46

Application Note 1 to USSG § 4B1.2 exceeds its authority under *Stinson*.
This was the holding in *United States v. Winstead*, 890 F.3d 1082, 1090-92
(D.C. Cir. 2018). *Winstead* found that counsel was ineffective for failing to
argue that two convictions for attempted distribution and attempted
possession with intent to distribute were not career offender predicates.
Winstead held that the Commentary, by expanding the Guideline to add
attempting to commit a crime, ran afoul of *Stinson*. "If the Commission
wishes to expand the definition of 'controlled substance offenses' to include
attempts," *Winstead* recited, "it may seek to amend the language of the
guidelines by submitting the change for congressional review." *Winstead*,
890 F.3d at 1092.

Mr. Miller also relies on *United States v. Havis*, 927 F.3d 382 (6th
Cir. 2019). *Havis* found that by making attempt crimes a part of § 4B1.2(b),
the Commission did not interpret a term in the guideline itself—no term in §
4B1.2(b) would bear that construction. Rather, the Commission used
Application Note 1 to add offenses not listed in the guideline. But
application notes are to be interpretations of, not additions to, the Guidelines
themselves. Accordingly, *Havis* found that the Commission's use of
commentary to add attempt crimes to the definition of "controlled substance

47

offense" deserves no deference. The text of § 4B1.2(b) controls, and it makes clear that attempt crimes do not qualify as controlled substance offenses. *Havis*, 927 F.3d at 386.

However, several circuits, including the Eighth Circuit, defer to Application Note 1 when applying § 4B1.2. *See e.g. United States v. Mendoza-Figueroa,* 65 F.3d 691 (8th Cir. 1995) (en banc). Mr. Miller raises this issue to preserve it in the event the Supreme Court favorably resolves the Circuit split.

> *(3)* In the absence of evidence of knowledge that the barrel of the shotgun was shorter than allowed by federal law, the firearm is not one described in *26 U.S.C. § 5845(a)*

It was alleged and confirmed that the barrel of the gun in Mr. Miller's apartment was 17 7/8 inches when measured to its longest point and one-eighth inch less at its shortest point. Because the firearm is fractionally shorter than 18 inches long, the length is barely within the limits described in 26 U.S.C § 5845(a)(1), namely, "a shotgun having a barrel or barrels of less than 18 inches in length" even though the overall length of the gun was more than 26 inches. The judge at the sentencing hearing found that the barrel being a fraction of an inch less than 18 inches, standing alone, was

48

sufficient to trigger the base offense level increase in USSG §2K2.1(a)(3). [Tr. Sentencing hearing, 8:7-13].

Although the length of the firearm in question was fractionally less than 18 inches, in the case of firearms, knowledge of the characteristics of the firearm is traditionally required for possession of the firearm to be illegal. *See Staples v. United States*, 511 U.S. 600, 605-606 (1994). *Staples* held that a federal machinegun registration statute that was silent on any mens rea element required knowledge of the characteristics of the firearm because the concept of mens rea is firmly embedded in the principles of Anglo-American criminal jurisprudence; *Accord, Rehaif v. United States*, *Rehaif v. United States*, 139 S. Ct. 2191 (2019), a case in which the Supreme Court held that in a prosecution under 18 U.S.C. §§ 922(g) and 924(a)(2), "the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."

There is no evidence that Mr. Miller was aware that the firearm's barrel was fractionally less than 18 inches long, and without close measurement, it was impossible to for anyone to have this knowledge. Accordingly, Mr. Miller asserts that it was contrary to traditional principles

49

of criminal justice jurisprudence to increase his offense level without proof he knew that the barrel was less than 18 inches.

### 2. Conclusion

For the reasons and upon the authority cited above, Mr. Miller requests that the Court find that he did not possess the shotgun found in his kitchen in connection with a felony assault offense; that his prior conviction is not a controlled substance offense; and that absent proof he knew that the firearm was a fraction of an inch less than 18 inches long, his guidelines offense level was improperly enhanced.

## IX.   CONCLUSION

Mr. Miller respectfully requests that the court find that, on the authority of the Fourth Amendment, that the police illegally seized the firearm located in the kitchen of his apartment and that his motions to suppress use of that firearm should have been suppressed; and that under the Ninth Amendment, firearms should be regulated by the States, not the federal government; and that his sentencing guideline sentencing range was improperly calculated.

Respectfully submitted,

50

_Mark Meyer_

MARK C. MEYER, Attorney for Appellant

# X.   CERTIFICATES

## CERTIFICATE OF FILING

I hereby certify that on 12/14/2020, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the

Eighth Circuit by using the CM/ECF system. I certify that all participants in

the case are registered CM/ECF users and that service will be accomplished

by the CM/ECF system.

_Mark Meyer_

MARK C. MEYER

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of

Fed. R. App. P. 32(a)(7)(B).  The brief uses a proportionally spaced, 14-

point Times New Roman font.  Based on a word/line count from Microsoft

51

Word 2007, this brief contains 11192 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

MARK C. MEYER

# XI.   ADDENDUM

Judgment in a Criminal Case, filed 8/28/2020...................1

Search warrant application and related documents............9

Report and Recommendation, filed 11/15/2019 ...............16

Memorandum Opinion and Order, filed 12/27/2019 .........59

Appellate Case: 20-2857    Page: 62    Date Filed: 12/15/2020 Entry ID: 4985259